Case number 245524, David Ermold et al. v. Kim Davis. Argument not to exceed 15 minutes per side. Mr. Staver, you may proceed for the appellant. Good morning, your honors. I'm Matt Staver on behalf of Kim Davis and I'd like to reserve three minutes for rebuttal. The verdict below should be reversed because the damages award is precluded by the First Amendment and the jury verdict solely based upon emotional distress without any compensatory component was speculatory. Kim Davis is now before this court in her personal individual capacity, totally stripped of her governmental immunity. In 2023, this case substantially changed when a jury verdict was awarded against Kim Davis solely based upon emotional distress damages with no compensatory component in her personal individual capacity. So this case is no longer just a government official in her official capacity asking for an accommodation. Well, counsel, when you say no compensatory, I mean, my understanding is that emotional distress damages are compensatory. They compensate for your emotional distress. They're not economic damages, but they're not punitive. They're definitely compensatory. But compensatory, Judge White, in the way we are looking at this, is that it must have some kind of computation component to it. In this particular case, what you have is zero evidence for $50,000 per plaintiff based solely upon emotional distress. There's no lost wages. There's no treatment. There's no injury. There's no out-of-pocket expenses. It's only based upon their hurt feelings that occurred when they went to the clerk's office to get the license and they said that Kim Davis' words caused them the distress. And in fact, David Ermold and David Moore said they had no basis to calculate the award. Moore said, I don't know how to come to that amount. Ermold admitted that he and David Moore chose this number, but they have no idea where the $50,000 per plaintiff came from. What case law do you have that you have to have some lost wages or, you know, medical proof, something along those lines to recover emotional damages? Well, you wouldn't have to have lost wages, Judge Mathis, necessarily. But in this particular case, say, for example, it's only emotional distress, so there is no lost wages component, but there's no treatment. So there's no out-of-pocket treatment. There's no objective third-party evidence that they can corroborate. There's nothing outside of their subjective testimony that they were mad or upset. They had no treatment. Your client said that they were upset. So, I mean, there is testimony outside of the plaintiff's testimony. Your client said that they were upset and things of that nature at the trial. But just being upset when they came to the counter to get the marriage license and raising their voice is not sufficient for a jury to award emotional damages based solely upon that information. How in the world would the jury, for example, calculate $50,000 for each plaintiff when they had nothing before them on which to calculate it? In fact, in the Yates case that was tried the same day in the same courtroom with the same evidence, they had corroborating evidence, but that jury came back with zero verdict based upon emotional distress. By the time we got to the trial, every claim, reputational, lost wages, and other kinds of compensatory damages were dropped. And the only thing that was remaining was emotional distress based upon hurt feelings. And those hurt feelings occurred, they said, at the clerk's counter. And that's when they said that they were distressed, that they were upset, but they had nothing to show to the jury. There was nothing for which the jury could deliberate to say $50,000 would be reasonable for David Moore and $50,000 would be reasonable for David Ermold. Nothing. They had zero evidence to that effect. And so when you have a case like this, when it's purely emotional distress with no out-of-pocket or no computational ability to determine what the award would be, totally based upon emotional stress, based upon words and or actions, it's no different than the Schneider v. Phelps case. In that particular case, the Supreme Court said that the First Amendment acts as a bar in a private suit against a private entity. If you have a private and a private, it's a First Amendment defense for defamation, even when it's an intentional act of emotional distress. And so what we have here is an individual who has been stripped of her governmental immunity so you have a private actor, the Ermolds and the Moores, you have a private actor now before this court. Is this a 1983 case? Yes, it is a 1983 case, Judge, but when you strip a person like Kim Davis who has two basic capabilities under a Section 1983, a government actor in their official capacity, immune from these kinds of damages, but now when you strip that person, they become, as this court said, even in the case below, this court said that they become an individual. And in fact, the title of the complaint and the orders were Kim Davis individually. She is before this court as an individual with no government protection, no government immunity. And so it's Kim... But the lack of government protection is the lack of qualified immunity, right? Correct. Okay. So in this... Those people are still government actors. They are coming after Kim Davis outside of her governmental ability, otherwise they would be precluded by the government immunity from the damages that they seek. Now, could they get injunctive relief against her in a personal capacity? Absolutely. Could they get damages against her? Is there any legal significance to the point you're making? I mean, the government arguments are important because we have to look at the constitutional rights at issue, if it's clearly established, and we do all that. And if the individual loses, then they stay in trial with... You're stripped of the immunity, as you say. But is there any legal significance to this point? There is. There is, Your Honor. Is it just equity's point that she's now sort of personally liable, you're saying? Or we should consider that as part of the award? Or what's the legal upshot? No, Judge Radler, I think there's two different aspects. As a government actor, she has been claiming an accommodation. Like, for example, the judge in the Texas Supreme Court got an accommodation from not issuing licenses to same-sex marriage. And that just happened in June of 2024. As a government actor, he was awarded accommodation by the Texas Supreme Court. That's challenging sort of the qualified immunity issue, I think. And to me, the problem there seems to be that she didn't try to avail herself of any of those rights she may have had under federal or state law vis-a-vis her employer to get an accommodation. She just refused herself to do this. No, Your Honor, I would... I don't know if I really want to fight that, because I really kind of want to see to where you're going. I'm not really sure the bigger sort of point you're getting to. I would say that she did do that. She asked for it, just like the judge in Texas, she refused. But the difference would be an accommodation for her official capacity, which this court would then need to consider as she entitled that. Or, in this case, now that she's stripped from all governmental protection, she has a First Amendment as an affirmative defense. Still a government actor. She just lost her immunity. But in this case, she is before this court. And the only reason why they have an emotional distress case is because she's in her individual personal capacity. And in that personal capacity, that's where you have the damage award. Otherwise, in any other category, she wouldn't be able to... they wouldn't be able to have a damages award. Your point is zero damages because she had a First Amendment affirmative defense? That's right. The jury should have... was the jury instructed on this? The jury... this was raised before the jury, yes. And we also... They really instructed on... you've raised an affirmative defense that she had the First Amendment right to resist awarding the licenses, and the jury found against her on that point? We have presented this to the judge before for that instruction, yes. And... but the judge did not say that as an affirmative defense. But yes, that has been something that we argued before the judge below. Your argument today is not 100,000 is too high, it should be zero because... Zero. She should have prevailed on this affirmative defense about her First Amendment right to speak, or to act. Our argument is twofold. One, that she should have zero damages based upon her affirmative defense from a First Amendment free speech or free exercise of religion case, just like in Schneider, the New York Times v. Sullivan, and Hussler case. But the other one would be that outside of the First Amendment, that there's no basis for which the jury could actually compute $50,000. That's the 100,000 was too high. It should be less or it should be zero. Well, it shouldn't have even gone to the jury. Well, in one case, the First Amendment is an absolute bar, no matter what the amount is. If it's a million dollars or a hundred thousand dollars, it's an absolute bar in this case because this court can impose upon her something that otherwise would be precluded by the First Amendment free speech or free exercise of religion clause. And so it would be zero no matter what the amount. In the other situation, it's zero because it should have never gone to the jury. And that was an argument we presented to the judge below. Probably the first argument, I guess, is that it's all private actors in those cases. Schneider v. Phelps was a private church group protesting at military funerals. So it's all groups to begin with. And Judge White's point is we start this case with a government employee. So those are all cases that started with New York Times v. Sullivan, private individuals at the outset. But this is not a case that started that way. So it's odd to say then, well, if we lose on that, then they become a private individual, but now they get the benefit of the First Amendment. It's a case that perhaps is a case of first impression before this court, but it is no different from a form or structural standpoint than a Schneider, than a Hustler, than a New York Times, or then the other cases, for example, from the Ninth Circuit, the Paul v. Watchtower Bible and Tract Society on free exercise, or the Texas Supreme Court, the Pleasant Glade Assembly of God. Those are private against private. And this case started out as private against a government actor. And within that context, these kind of damages would not have been permissible. But then, throughout the litigation, she has been stripped of that governmental protection. So she's Kim Davis in her personal capacity. Are you saying that she wasn't engaged in state action? Is that your argument? What their argument is to strip her is that she's outside of state action. Are you saying she was not engaged in state action? Well, I'm saying, Your Honor, Judge Mathis, is that she was a state actor. And that's where she had sovereign immunity originally. But then they stripped her of the qualified immunity and came after her in her individual capacity. And so in that capacity, in one capacity, she has two capacities. One would be a private actor or individual capacity. The other would be a government capacity. And so it started off as, obviously, government. But then when they stripped her, it becomes private against her and her personal individual capacity. And in that case, she has an affirmative defense under the First Amendment. Can I give you a hypothetical? There are two police officers, and they encounter somebody on a street, and they pull their guns, and they start screaming racial epithets. And obviously, the two people that they're doing this to are pretty upset. So they sue. And the officers assert qualified immunity, and the judge says, You don't have any qualified damages? Or do they, once they lose their immunity, they have a First Amendment right to express their feelings about blacks or Jews? They clearly, in fact, would not have immunity if they did some other thing outside of speech, if they did something only with regards to speech. I should eliminate the guns. There's no assault there. It's all verbal, and they're just spewing a lot of vile words. Can they recover? Or once they lose their qualified immunity, all of a sudden, they have First Amendment rights? And there's no damages because they didn't lose work? No, that's a different question, because in Schneider, for example, it talks about speech that's public concern versus private. In that case, they're speaking directly to somebody. They're not speaking on something that is to the general public. And in that case, there is no immunity. In Schneider, they said that in the case of the protest at the funeral, they were speaking generally writ large. Some of the things that they were talking about is gay rights and other kinds of things. It was very offensive, but it was generally. And so that public expression of a public concern is treated differently than your hypothetical with the police officer speaking directly to this person. So what is the protected speech here? Speech on a public concern, actions motivated by religious free exercise on a public concern regarding same-sex marriage. And that's clearly what was before this case. That's clearly the facts of this case. It's clearly public. And it's the same kind of thing that this court decided in Armstrong in the Sixth Circuit with the university situation. And the court recognized the First Amendment can apply as an affirmative defense to emotional distress claims, but also made that distinction between that the speech has to be a public concern. The court found that there was no immunity there, no First Amendment defense there, I should say, because he spoke specifically on a person's private Facebook, a personal attack against someone about his sexual orientation. And so that did not have First Amendment protection. So that's a significant difference between that hypothetical and what we have here. We have a public concern issue, an action and words based upon religious free exercise, and she's being held personally responsible in her individual personal capacity for damages based solely upon emotional distress with no other computation. Okay, we went over your time, but you'll get your rebuttal time also. Thank you. Good morning, Your Honor, and may it please the court, Bill Powell on behalf of David Ermold and David Moore. This marks the third time that Miss Davis has appealed to this court in this case. This court rejected her two prior appeals. Those decisions are now the law of this case, and they largely resolve this final judgment appeal as well. Specifically, it is the law of this case that Miss Davis violated the plaintiff's 14th Amendment right to marry when she denied them a marriage license in defiance of the Supreme Court's decision in Obergefell. And it is the this case that that 14th Amendment right was clearly established at the time of the denial, such that Miss Davis is not entitled to qualified immunity. Yes, so I'd like to clarify a couple of things in that regard. This is a 1983 lawsuit, and 1983 lawsuits seek recompense for actions taken under color of state law. That is true for a suit against an official in their official capacity, and that is also true for a suit against an official in their individual capacity. The Supreme Court's decision in Lindkey explained this when it said that, as its text makes clear, section 1983 protects against acts attributable to a state, not those of a private person. That's at pin site 194, and that was an individual capacity lawsuit as footnote one of the Supreme of course has different First Amendment rights and defenses, as in the New York Times v. Sullivan case or as in the Snyder v. Phelps case, but that is different than an official sued in their individual capacity. And I think it is quite telling that despite the mountains of decisions that are lawsuits against officials in their individual capacity, all of qualified immunity law, as you mentioned, arises in that context. Miss Davis has cited not a single case recognizing a First Amendment defense to a 1983 lawsuit, and that is because when a government official acts under color of state law, they do not have that kind of First Amendment protection. Even if you disagreed with that, and even if you thought that Miss Davis had some kind of First Amendment protections in her job, it would have to be for speech that she took in her private capacity outside of her official duties. And that is not what happened here. The allegations are that she denied this marriage license as the core of her public duty as a county clerk. And even if you disagreed with that and thought that she could potentially get an accommodation under the First Amendment, the accommodation that she requested and the accommodation that she ultimately received were both to not have her name on the marriage license. But that is not the accommodation that she gave herself without following the proper procedures in this case. The accommodation that she gave herself was to make it the official policy of her entire office not to issue marriage licenses to same-sex couples, even her subordinates. And that kind of an accommodation, as Judge Bush said in his concurrence in the 2019 decision, took the law into her own hands, and there was no possible justification for that. So can I back up to the clearly established question? I know your first argument is going to be we've already decided that, but sometimes we revisit things. So just suppose it was just de novo, we were looking at the issue. So the point of clearly established law is we want the individual office holder or officer to be on notice that their precise conduct or something very close to their conduct is outlawed. And so Abel Bergefell, whichever one agrees, says that there's a constitutional right to same-sex marriage. How does that speak more precisely to the facts here of a local official who believes she has some First Amendment rights and obligations in this context and so wants to resist herself and maybe those who are subordinates who are exercising her authority to resist awarding these licenses? She thinks it violates her personal beliefs and her rights protected by the First Amendment. So it's a very high principle. How do we get down to that being clearly established that Ms. Davis can't do the precise thing she did? Yes, Your Honor. So as you predicted, I do want to cling to love the case on that. And in the 2019 decision, aired this issue specifically in the court in that opinion, understood and explained that qualified immunity, the right, as you said, has to be defined at a particular level of granularity. And I think here there are two or three things that I would mention. So first of all, Obergefell itself said that states must license same-sex marriages under their state regimes, which they have leeway to tailor on the same terms as any other couple. And I think a local official would understand that that meant they had to comply with whatever their state law regime was in issuing those marriage licenses. I think that's number one. Number two is that Ms. Davis... Does the opinion say anything about the First Amendment specifically and whether a local officeholder has some First Amendment religious view that conflicts and how that gets played out? So yes, they didn't use the First Amendment specifically, but the paragraph that my friend has quoted from Obergefell starts out by saying that folks who have strong religious objections to same-sex marriage will be able to continue to advocate in their private capacities against same-sex marriage. And the opinion casts no doubt on the ability of people to continue to oppose same-sex marriage, but the state cannot continue to discriminate against same-sex couples. And so I think in that paragraph it makes quite clear the different roles and the different hats that Ms. Davis was wearing and what her obligations were in those different hats. At the time, there were a lot of state laws or state court decisions that barred same-sex marriage. So it could be speaking to that. And here we have a very precise context of a local officeholder who's got personal views. So is that not distinguishable at all? In other words, like in the officer context, there's things that the very high-level officers can't do, but we always look at the facts and say, what did they do here when they've been noticed that something roughly like this fact pattern was prohibited? And if it's not, we might say it was a violation, but it wasn't clearly established. And maybe for the next case, it's now clearly established after our prior decision. But we do give officeholders sort of the benefit of the doubt if it's a close case. We really want direct markers to tell them that what they're doing is wrong, so they don't do it. And so there's a lot of generalities in Obergefell, but how do we get this precise context? Right. So a couple of the other answers I was going to give, I think, get a little more specific. So I'll try them on you. The first is that she received a letter from the governor that directed her to issue the marriage licenses and that said, whatever your conscience may be in your private capacity, when you act as an official, you have an obligation to do this, which is a correct statement of law. As I said earlier, there is no First Amendment defense to a 1983 lawsuit. And then second, she spoke to the county attorney. There's testimony about this at trial. And asked him, what are my obligations here? And he said, in no uncertain terms, you have to issue the licenses. You do not have a defense. I think the exact quote was, your insurance carrier will drop you like a hot potato if you don't issue these licenses because you have a... Fair points. None of those are court decisions. Usually we look to court decisions to what the markers are. So are you saying there's an analogous case that says, if the governor of your state issues an order that says you have to do something in compliance with the Supreme Court decision, you don't have qualified immunity to ignore that? Is there a case that says that? Or you consult with your local attorney and they say something, so you no longer have qualified immunity if you do something different? I think those are helpful guidance to an official in understanding what a case means, what their legal obligations are under a case. And here I think that case is Obergefell. We usually look to cases, right? What were our prior cases? When we go through the litany of cases, which side of the line was it on? Yes, Your Honor. You're pointing to facts that I think are relevant, but not actually cases that we would look at, that we presume, it's a little bit of a fiction, but we presume officials are aware of our cases and know what they can and can't do. Well, the other important point here, Your Honor, is that I think we generally look to those cases to determine what the scope of the plaintiff's right is. And here the plaintiff's right is their 14th Amendment right. And I think the scope of that right is very clearly established in Obergefell. We don't generally look at those cases to determine what was clearly established about the countervailing rights of the official. Again, there's no case that suggests that an official can even bring a constitutional affirmative defense to a 1983 lawsuit. So we don't have any cases to suggest one or the other about how you would consider that type of an issue. But I don't think that would go to the qualified immunity aspect. That would just be about what is her countervailing right, if any. I think she doesn't have a countervailing right. But what we're asking for in the clearly established analysis is just what was the 14th Amendment right clearly established. Other than the First Amendment defense, the qualified immunity issue has already been decided, right? That's correct. So at the motion to dismiss stage, this court analyzed qualified immunity and then did so again in her appeal from the summary judgment decision. And in the summary judgment opinion, the court said that the plaintiffs had not only alleged but also shown that Ms. Davis had violated their clearly established 14th Amendment rights. So that is the law of this case. And nothing has changed with respect to either the First Amendment affirmative defense or the 14th Amendment claim because summary judgment in this case was granted to the plaintiffs. And so the trial was only on damages. So literally nothing has changed with respect to either of those two issues since the prior appeal. Just moving along, how do you explain the verdicts? Yes. So plaintiffs here testified extensively about the emotional harm that they suffered. There was extensive testimony from both plaintiffs. And I think that testimony stacks up, I think, quite well with other cases where this court has affirmed emotional distress damages. I would point to your decisions in Turek, in Smith, and in Moorer. In each of those cases, the testimony was primarily that of the plaintiff and of their spouse, as it was here. And in those cases, the testimony about emotional distress damages, I think, was quite similar to that here, which was about humiliation, about the ways in which the defendant's conduct had impacted various aspects of their lives. And in Turek, you said that you can award emotional distress damages under 1983 based on the plaintiff's testimony combined with the circumstances of the case. And so I think there are a couple of things I'd like to point to in the trial record here in that regard. So the first is harm that resulted directly from the denial in the immediate aftermath of that. So that is impacts on their wedding, on the ability to even schedule their wedding because they were denied three times and then had to figure it out after that. And I think that is a type of harm that any reasonable juror could understand because everyone understands that a wedding is one of the most important moments in any person's life. And to have this cloud cast over it would cause a great deal of harm to anyone. And the second thing, and that aligns nicely within Smith. So Smith was a case about a background check that incorrectly showed that someone had a criminal record. And that was corrected and the person was still able to get their job, but the jury awarded emotional distress damages in part because of the harm to their standing in the community and their reputation. And one of the examples was that the plaintiff went into a party store and the owner said, oh look, it's my favorite felon, when actually he didn't have a criminal record. And I think that compares to testimony that Plaintiff Moore gave at trial. This is on page ID 2824 where he was talking about how every time he talks about his wedding with friends or family who come over, the first thing anyone mentions is Kim Davis denying their marriage license rather than their happy memories about their wedding. And that is a similar type of emotional harm, I think. The other thing I would mention is that some of the cases that my friend has cited that say the emotional distress damages can't be based only on sort of brief conclusory testimony about hurt feelings by the plaintiffs. That was not what we had here because the plaintiffs here testified not just about those harms and the immediate aftermath to their emotional well-being, but also testified to longer-term impacts on their relationship. Plaintiff Ermold testified about ways in which this had exacerbated his PTSD and mental health issues, talked about how it affected his performance at work over time. And I think, you know, I would just encourage you to look closely at the trial testimony because I think it was quite powerful in this regard. And I think the credibility determination made by the jury, which this court should not second-guess, was based on what I think was a lot of honesty from the plaintiffs. Plaintiff Ermold, I think, could have said, Kim Davis is to blame for all my problems. But that's not what he said at trial. He said, I've had mental health issues. I can't say they're all because of her, but they got worse after this. And he said, I'm not sure that's why I was fired from my job at the University of Pikeville, but I did get fired the day after her book came out and it felt a little bit like it had something to do with it. And I think those were the kinds of really honest testimony that the jury could credit in this case. The one other point I would make about the verdict before my time expires is that, and I think my friend may have conceded this today, because they filed a motion for judgment as a matter of law and in that motion did not include a request for a remitter or a new trial, they can challenge the existence of any damages, but they cannot ask for a reduction in the amount of damages. So as long as my clients had enough testimony to support $1 in damages, then the argument that there should be zero should fail. And unless there are other questions, I would ask the court to affirm. Thank you. Appreciate your arguments. We'll hear the rebuttal. Judge Radler, your comment about the clearly established, in this particular case, a burger fell came down the last Friday of June 2015. This issue then began the very next week, the first week of the July 4th weekend. And it was only the request to have her name removed, and that was the request, and that's what she ultimately had accomplished when she actually was remanded to jail. Her name was removed, the governor approved that, the new governor actually provided an executive order in December of 2015, and the legislature gave a legislative exemption to clerks to have their names removed in April of 2016. That's all she asked for, is her name to be removed. And it was a very short period of time. So when Burgerville comes down at the last Friday of 2015, in June, it's a general proposition that same-sex marriage is the decision from the United States Supreme Court. But it's not specific as to relating to a clerk of a county in Rowan County, or any other county, cannot remove their name, or cannot request their name, or have a little period of time to try to resolve this. In fact, the president of the Senate, of the legislature back then, issued an amicus brief in defense of Kim Davis, and said, after the Supreme Court issued its decision, the marriage statutes in Kentucky were shredded, because they're all gender-based, male and female. And so Kim Davis, in her duty, totally constrained by what the law says. She can't act one way or the other without the law's approval. Otherwise, it's a misdemeanor offense. She's stuck in a situation where the law that's there, including the Constitution, says one thing. The Supreme Court says another thing that just comes down. And the legislature needed to act, which it hadn't done yet. And that's what the president of the Senate said, is that Kim Davis was unable to act, because the laws were shredded. And consequently, the legislature had to act. So Kim Davis did what she tried to do, and that's just simply accommodate her and others by removing her name. That's all she asked for. It's a very simple request, and that's what she got. She's now here, however, facing $360,000 in her individual capacity. $100,000 for damages based solely upon emotional distress, and then $260,000 for attorney's fees and costs. $360,000 for a short period of time after a burger fill, for which she's already gotten accommodation by Governor Beshears, by removing her name, by Governor Matt Bevins, the new governor, and by the legislature. And that's exactly all that she wanted to do. And she shouldn't be, before this court, stripped of her governmental protections, and then find $100,000 plus another $260,000. The First Amendment just simply can't countenance that, because she has a clear First Amendment free exercise right to an accommodation, and she also has a free exercise right in her personal capacity as an affirmative defense. And finally, the order just simply doesn't have any basis to calculate $50,000. It was pulled out of thin air. Even the plaintiffs said they didn't know how to calculate it. How in the world can the jury calculate what the plaintiffs cannot? Okay, great. Thank you. Cases well argued will be submitted, and we will advise you of our decision.